**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TOM LOCKHART,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **2:08-cv-993** |
| **v.** | ) | |
| | ) | |
| **STATE FARM MUTUAL AUTOMOBILE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER OF COURT**</u>

Pending before the Court is DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 (Document No. 34).  The motion has been thoroughly briefed by both State Farm and Lockhart (Document Nos. 35, 45).  The parties have fully stated their respective positions regarding the Concise Statement of Material Facts and have submitted numerous exhibits (Document Nos. 36, 38, 39, 40, 43, 44, 46, 47, 50).  The Court heard oral argument on January 28, 2010.  The motion is ripe for disposition.

<u>Factual Background</u>

This is an automobile insurance coverage dispute.  At the time of the incident, Tom Lockhart was 55 years old and had been married to his wife, Rhonda, for thirty-six years.  They have three grown daughters, one of whom is a police officer.  Lockhart had been employed as a foreman for Onex Corporation for the past fifteen years and his gross annual income was well in excess of $100,000.  Onex paid Lockhart $747 per month for the use of his personal truck.

On Sunday morning, May 20, 2007, Lockhart reported that his 2006 Dodge Ram Pickup

Truck had been stolen from the parking lot of a Giant Eagle supermarket in White Oak,

Pennsylvania.  According to Lockhart, he had parked the truck in an employee parking area along

the side of the store next to a guard rail, shopped for approximately 30-45 minutes, and then

discovered that the truck was missing.  He immediately reported the theft to the police.

Sergeant Robert Loera responded to the scene and prepared an incident report.  In

relevant part, the Report stated:

> Mr. Lockhart said that he had secured the truck, and he was in possession of the
> key(s).  No broken glass was left at the scene.  A few supermarket employees
> attending to their duties stated that they had seen nothing out of the ordinary.

The incident report also noted Lockhart's description that the truck had 20" wheels, dual hood

scoops and other options, and multiple chrome accessories.  Exhibit AE 11.

Lockhart had purchased the truck in May 2006.  He had a practice of purchasing a new

truck on roughly an annual basis.  He had visited several dealers in the weeks prior to the

reported theft in an effort to trade in the truck for a new vehicle.  In December 2006, Lockhart

had taken the truck in for service with a complaint about its steering and was informed that

nothing could be done to remedy that situation.

Lockhart submitted a claim to State Farm on May 21, 2007.  His automobile insurance

Policy, #0139827-A01-38N, covered theft but excluded coverage if the vehicle was stolen "by or

at the direction of an Insured."  Lockhart purchased "GAP insurance" for the difference between

the cash value of the vehicle and the amount owed on the note, which  was approximately

$10,000 at the time of the incident.

2

Paragraph 11 of the Policy provides as follows:

11.     Concealment or Fraud

There is no coverage under this policy if you or any other person insured under this policy has made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under this policy.

On May 22, 2007, State Farm claims representative Jackie Rocha spoke with Lockhart. The claim file reflects that Lockhart told Rocha that the vehicle was locked and that there were two sets of keys -- one in Lockhart's possession and the other taped underneath the center console of the truck.  State Farm's records also reflect that Lockhart had made a prior vehicle theft claim on January 3, 2003.  State Farm had paid the 2003 theft claim without conducting any investigation.

On May 24, 2007, State Farm's Special Investigations Unit ("SIU") accepted the file as a "partial referral to interview [the insured] and clarify facts of attempted trade in, conduct scene investigation and follow up with law enforcement to determine if further investigation is warranted."  Dom Pelligrino, the manager of the SIU, assigned Larry Kletter to undertake the investigation.

The claim file reflects that on May 24, 2007 Kletter spoke to State Farm agent Bob Rodgers, who related Lockhart's history as a State Farm policyholder since 2000 and described Lockhart as a "mean character."  Kletter also spoke to Ms. Rocha, who stated that Lockhart had been "overly nice" in their conversation and had explained that a "key was hidden in the console but no-one knew [the] key was there and no-one would ever find it."

On May 25, 2007, Kletter contacted Lockhart and informed him of the investigation. They agreed to meet on May 30, 2007 to discuss the matter.  Kletter obtained information about

the truck and learned that it was equipped with a Sentry Key Theft Deterrent System.  Kletter
also learned that on May 17, 2007 Lockhart had discussed figures for the trade of his truck on a
new 2007 Dodge Ram truck.

On May 30, 2007, Kletter interviewed Lockhart.  A transcript of the interview was
provided.  Among other topics, they discussed the circumstances surrounding the 2003 vehicle
theft claim.  According to Lockhart, that vehicle (a 2001 Ford truck) had been locked and parked
at his workplace overnight while he attended a motorcycle "swap meet" in Chillicothe, Ohio.
When Lockhart returned the next day, the truck was gone.  There were no signs of forced entry.
Lockhart had approximately $4,000 or $5,000 in GAP coverage on that vehicle.  Turning to the
2007 claim, Kletter asked Lockhart whether he recalled what he had done on the day prior to the
theft (eleven days prior to the date of the interview).  Lockhart answered "No."  Lockhart
estimated that he had shopped in the Giant Eagle for thirty minutes on the morning of the loss.
Kletter asked whether Lockhart had locked the truck before he went into the store.  The
following exchange ensued:

A: (by Lockhart): "I want to say yes.  That's ... yes.

Q: (by Kletter):"Okay, because ...and I know with the remote, I always push the button.

A: It's my habit.

Q: Okay, so you.. When you park the car you push the button?

A: Yes.

After the interview with Lockhart, Kletter obtained Sergeant Loera's incident report and
spoke to the officer on June 2, 2007.  Loera confirmed that he had investigated the incident and
found no broken glass or other evidence of a break-in, and that two employees who were working

outside the Giant Eagle had not noticed any suspicious activity.  Kletter's notes of his call with

Loera reflect the following:

> Sgt. Loera asked the insured if there was a key attached to or inside the vehicle.
> At that point, the insured interrupted Sgt. Loera, pulled out his key, and said, "No,
> no, no!"  Sgt. Loera then continued to say, "You know, like a magnetic key holder
> people put a spare key in."  The insured answered no to that question.

Kletter noted that this statement was inconsistent with Lockhart's statement, in the May 30, 2007

interview, that there _was_ a spare key in the vehicle.

On June 28, 2007, at Kletter's request, Keith Stephan prepared an expert report regarding

the anti-theft system on Lockhart's truck.  Stephan opined that there was only a "remote"

possibility that the vehicle was stolen without use of a key, because a security transponder is pre-

programmed into the key by the manufacturer.  He further opined that it would take a minimum

of thirty minutes to remove, replace and reprogram the transponder modules to start the vehicle,

and that the use of a tow truck would have been noticed by onlookers.

Kletter talked to Kathie Sandin, who was assigned to work outside of the Giant Eagle on

May 20 (in full view of the location where Lockhart reported that he parked the truck).  Sandin

did not recall anything happening out of the ordinary that morning.  In a followup conversation

on July 2, 2007, Sandin explained that she was working at the floral station outside the main door

on May 20th.  She arrived approximately 5-10 minutes before the start of her 10:00 a.m. shift and

parked by the same "creekside" guardrail described by Lockhart.  She further stated that she was

"into trucks" and did not remember seeing a truck like Lockhart's, especially one that was

"chromed up with special stripes."  Nor did Sandin recall seeing a tow truck that day.

On August 17, 2007, Lockhart testified in an Examination Under Oath ("EUO").  A

transcript has been provided.  Among other topics, Lockhart explained the circumstances surrounding the theft claim he had made in 2003 (i.e., that he had been away overnight at a motorcycle rally in Chillicothe, Ohio and returned to find his 2001 truck missing).  When asked what he had done on the Saturday prior to the May 20, 2007 theft, Lockhart replied: "Not too much.  Stayed around the house."  Lockhart did not have any other specific recollection of what he did that day.  Lockhart did not know whether he had locked his truck on the day of the loss. In the discussion, Lockhart explained that it was _not_ his habit to lock his vehicle every time he got out of it, and that he normally did not lock it because most of the time he was in a guarded area or at home.

On August 31, 2007, Kletter re-interviewed Sergeant Loera.  Loera specifically remembered that he had asked Lockhart if he had a key on or in the vehicle at the time the theft occurred.  Loera specifically asked about a magnetic key box that might have been under the fender well or anywhere else on the vehicle.[1]  Loera's standard practice in any stolen vehicle claim was to ask whether the vehicle was locked and the windows were locked.  Loera checked his incident report and confirmed that Lockhart had told him that the truck was secured.  Loera further recalled that Lockhart showed him the keys to the truck in his hand.

Kletter never received cell phone records which he had requested from Lockhart.  Nor was Kletter able to speak with Mrs. Lockhart, although he asked Plaintiff to have her call him and he sent a contact letter to her.  Upon the conclusion of his investigation, Kletter

---

[1]In his deposition, Loera testified that he was certain that he asked Lockhart whether there was a possibility that he had hidden a spare key on or in the vehicle and that Lockhart said "no." Loera Deposition at 36.  Loera also testified that it was very rare for vehicles to be stolen from the Giant Eagle parking lot, and that this incident was "highly unusual" because it was broad daylight near the main door of a busy shopping center.  Loera Deposition at 52, 54-55.

recommended that Lockhart's claim be denied.

Pellegrino then prepared a Claim Decision Report ("CDR") for consideration by Lee Affel, the State Farm section manager and final decision-maker. (AE 16). The CDR appears to be undated, but there is a handwritten notation "OK" which is dated October 22, 2007. The CDR outlined the circumstances of the loss and Lockhart's personal and financial profile, summarized the investigation and explained why the SIU recommended denial of the claim. The CDR identified similarities between the 2007 claim and the prior theft claim in 2003: (1) both vehicles were equipped with transponder type anti-theft devices, (2) there was no evidence of forced entry at the scene, (3) Lockhart was over-insured, (4) he presented only one key, (5) neither vehicle was recovered, and (6) both losses were discovered on a Sunday morning. The CRD also recited numerous "discrepancies" in Lockhart's statements. In summary, the investigation concluded that the loss was not direct, sudden and accidental as defined under the policy, and that Lockhart had made material misrepresentations during the presentation of the claim.

On October 4, 2007, Pellegrino sent Affel an email which stated:

A new CDR for review. I will be out on vacation by the time you review this one, so you might want to deal directly with Larry on it. I think the claim should not be compensable, but the motive is an issue. [redacted] I would think he will file suit, but I can't reward another fraudulent claim from him.

On October 8, 2007, Affel sent Kletter an email regarding an apparent discrepancy between Lockhart's reported annual and monthly income.

On October 29, 2007, Pelligrino sent a letter to Lockhart, which denied the claim and listed six reasons for that decision:

1.    That Giant Eagle employees did not see the distinctive truck parked there on May 20, 2007 and did not notice any unusual activity.

2.      Important discrepancies between what Lockhart told the responding police officer and what he told State Farm regarding the keys.

3.      No signs of forced entry, and the key hidden in the vehicle was known only to Lockhart.

4.      Financial complications with Lockhart's efforts to trade the truck, and the existence of GAP coverage in the event of a loss.

5.      The existence of the anti-theft system, which would have been difficult to defeat in the time window available, and the lack of any suspicious activity noted by witnesses; and

6.      Mrs. Lockhart's failure to contact State Farm during the investigation.

This litigation followed.  On May 20, 2009 (exactly two years after the loss), Lockhart was deposed.  Lockhart did not recall whether he had locked the truck when he went into the Giant Eagle on May 20, 2007, but testified that it was his "routine practice" to leave the truck unlocked.  When asked about his activities the day prior to the loss, Lockhart stated that he "went to The Meadows" with his wife during the "afternoon, the evening."  Deposition at 87-91. Lockhart further testified that they ate dinner at Cracker Barrel in Washington, Pennsylvania on the way.  Lockhart denied making any other stops that evening and recalled that his wife had won money while gambling at The Meadows.  Lockhart did not recall what he had done earlier in the day.  *Id.*  Lockhart denied having been in Wheeling, West Virginia, or anywhere in West Virginia on May 19, 2007.  Deposition at 194.  Lockhart reiterated that he and his wife were at The Meadows, that his cell phone was in the van parked at The Meadows, and that his wife had her cell phone with her.  Deposition at 197-98.  Lockhart could not explain why cell phone records reflected calls on both his cell phone and his wife's cell phone that originated from Wheeling, West Virginia between 6:20 p.m and 6:36 p.m. on May 19, 2007, and denied repeatedly that he

had been in that vicinity.[2]

A Verizon employee, Jason Forman, authenticated the Lockharts' cell phone billing records but explained that the physical location from which the calls were made could not be determined from those records. State Farm then engaged Ozan Tonguz, a professor of electrical and computer engineering at Carnegie Mellon University, to render an expert opinion. Professor Tonguz explained cell tower technology and opined that the cell phone calls on May 19, 2007 by Mr. and Mrs. Lockhart originated within a distance of two miles from the center of Wheeling, West Virginia and that it was not credible that Lockhart was in Washington, Pennsylvania when the calls were made.

Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

[Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).

---

[2]Lockhart filed an errata sheet to explain that he was not sure that the 2003 motorcycle rally had been sponsored by Easy Rider, but did not revise his testimony regarding May 19, 2007.

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Celotex*, 477 U.S. at 323. The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (*quoting Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)). Final credibility determinations on material issues cannot be made in the context of a motion for summary judgment, nor can the district court weigh the evidence. *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. If the moving party has carried this burden, the burden shifts to the non-moving party, who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230. When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-250.

10

Legal Analysis

The complaint in this diversity case asserts two claims under Pennsylvania law: (1) bad faith insurance practices pursuant to 42 Pa.C.S.A. § 8371; and (2) breach of contract. State Farm has moved for summary judgment as to both claims, which will be addressed seriatim.

A.      Bad Faith

Plaintiff must establish two elements to succeed on a bad faith insurance claim: (1) that the insurer did not have a reasonable basis for denying benefits under the policy; and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim. *W.V. Realty Inc. v. Northern Ins. Co.*, 334 F.3d 306, 312 (3d Cir. 2003). The term "bad faith" is not defined in the statute but has been described as a "frivolous or unfounded refusal to pay proceeds of a policy," which "imports a dishonest purpose and means a breach of a known duty ( i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith." *Terletsky v. Prudential Prop. and Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. 1994). Bad faith claims may also be based on an insurer's investigative practices.

Importantly, there is a heightened burden of proof, such that a plaintiff must show the insurer's bad faith by clear and convincing evidence. The "clear and convincing" standard requires evidence of bad faith " 'so clear, direct, weighty and convincing' so as to enable the [factfinder] to make its decision with 'a clear conviction.' " *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 752 (3d Cir. 1994). Plaintiff's burden in opposing summary judgment is commensurately high. *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004).

In *Wedemeyer v. U.S. Life Ins. Co. in City of New York,* 2007 WL 710290 (E.D. Pa.

11

2007), the Court explained that a bad faith claim cannot succeed if the insurer acted reasonably:

> Our courts have repeatedly held that an insurance company's substantial and thorough investigation of an insurance claim, which forms the basis of its refusal to make or continue making benefit payments, establishes a reasonable basis that defeats a bad faith claim. *Mann v. UNUM Life Ins. Co. of America*, No. 02-1346, 2003 WL 22917545, at *6 (E.D.Pa. Nov.25, 2003) (citing cases); *see also Montgomery v. Federal Ins. Co.*, 836 F.Supp. 292, 298 (E.D.Pa.1993) (holding that defendant's denial of claim was not in bad faith where it conducted an extensive investigation and provided evidence to support its reasonable basis).

> As one court explained:

>> To defeat a bad faith claim, the insurance company need not show that the process used to reach its conclusion was flawless or that its investigatory methods eliminated possibilities at odds with its conclusion. Rather, an insurance company simply must show that it conducted a review or investigation sufficiently thorough to yield a reasonable foundation for its action.

> *Mann*, 2003 WL 22917545, at *7.

The *Wedemeyer* Court further explained: "The first element is objective, so if a reasonable basis exists for an insurer's decision, even if the insurer did not rely on that reason, there cannot be bad faith." *Id.* at *9.

Applying these legal principles to the evidentiary record in this case, the Court concludes that State Farm is entitled to summary judgment on the bad faith claim. According to police officer Loera, the circumstances of the theft as described by Lockhart were "highly unusual" and warranted an investigation, given the low crime area, broad daylight, busy supermarket and short time window. No witness observed any suspicious activity or even saw Lockhart's truck there that morning. It is readily apparent that Kletter performed a lengthy, detailed investigation of the circumstances of Lockhart's claim. The investigation included discussions with Lockhart, the responding police officer, Giant Eagle employees and car dealers, a site visit, and a report

regarding the Sentry Key security system on the truck.  During that investigation, Lockhart made several apparently contradictory statements – whether the truck was locked, whether there was a spare key in the vehicle, and his whereabouts on the day prior to the incident.  Adding to the reasonable suspicions raised by this claim, the truck was overinsured, Lockhart had been trying to trade the truck in the days and weeks prior to the incident, and he had made a similar theft loss claim five years prior.  State Farm had a reasonable foundation for its decision to deny coverage.

Plaintiff argues, citing Pellegrino's email, that State Farm's "real" reason for denying this claim was to make up for its payment of the 2003 theft claim, which it now regarded as having been fraudulent.  However, Pellegrino's email was drafted in October 2007 – *after* Kletter's investigation had been completed – and could not have influenced how the investigation was performed.  Moreover, regardless of Pellegrino's motive, the investigation unearthed sufficient information to make State Farm's decision objectively reasonable.  *See Wedemeyer*.  Plaintiff also points to the lack of motive, given Lockhart's family and financial security and stability.  However, State Farm explicitly recognized that "motive is an issue" and considered that factor in reaching its decision.  Plaintiff also points to agent Rodgers' comment that Lockhart was a "mean character."  However, there is absolutely no evidence that this stray comment had any effect whatsoever on Kletter's investigation or Affel's final decision.  Finally, Plaintiff points to the opinion of its expert witness, Robert Garvin, who headed the SIU unit of another insurance company.  In essence, Garvin opined that State Farm had failed to consider the facts obtained during the investigation in the light most favorable to its insured.  In his deposition, Garvin conceded that State Farm had a reasonable basis to conduct a thorough investigation, that Lockhart had made "inconsistencies" during the course of the investigation, and that the

existence of GAP coverage provided at least some potential motive for Lockhart.  The Court concludes that Garvin's opinion as to the bad faith claim is not supported by the evidentiary record.  In sum, a reasonable factfinder could not conclude by clear and convincing evidence that State Farm acted in bad faith.

      B.      Breach of Contract

It is undisputed that the parties entered into an insurance contract.  Lockhart argues that State Farm breached the contract by failing to provide coverage for the theft of his truck.  State Farm contends: (1) that there is no coverage for a vehicle that is stolen "by or at the direction of an Insured"; and (2) that Lockhart breached the policy because he "made false statements with the intent to conceal or misrepresent any material fact or circumstance in connection with any claim under [the] policy."  In marked contrast to a bad faith claim, Plaintiff need only prove a breach of contract by a preponderance of the evidence.

The truck has never been recovered.  State Farm has not presented any direct evidence that the truck was stolen by, or at the direction of, Lockhart.  Rather, it has merely gathered circumstantial evidence which casts doubt on the plausibility of the claim presented by Lockhart.  The record is not sufficient to determine, as a matter of law, whether the "theft" provision of the policy was breached by Lockhart.

The question of whether Lockhart breached the "concealment or fraud" provision of the policy is a somewhat closer question.  After close scrutiny of the evidentiary record, the Court concludes that credibility questions and disputed issues of material fact exist which prevent the entry of summary judgment on the breach of contract claim.  In *Montgomery*, 836 F. Supp. at

295-96, the Court explained the legal principles which govern "fraud or concealment" clauses:

> In order to rescind an insurance policy for fraud or misrepresentation in Pennsylvania, an insurer must prove three elements. First, the insurer must prove that the representation was false. Second, the insurer must prove that the insured knew the representation was false when it was made or that it was made in bad faith. Finally, the insurer must prove that the representation was material to the risk being insured.

"In the context of an insured's post-loss investigation, the materiality requirement is satisfied if the false statement contains a subject relevant and germane to the insurer's investigation as it was then proceeding." *Saracco v. Vigilant Ins. Co.*, 2000 WL 202274 *5 (E.D. Pa. Feb.22, 2000).  An insured activities on the day prior to the loss are material. *Rocco v. Continental Ins. Co.*, 2003 WL 21235478 *8 (Conn. Super. Ct. 2003).

State Farm points to alleged misrepresentations regarding whether there was a spare key and whether it was Lockhart's habit to lock the truck.  However, a reasonable fact finder construing the facts in the light most favorable to the non-moving party could conclude that Lockhart's responses were not "false" or made "with the intent to conceal or misrepresent" a material fact.  There is room for interpretation as to whether Lockhart was asked about keys "on" or "in" the truck.  It is also possible to reconcile the idea of generally locking the truck in a supermarket parking lot with the habit of leaving the truck unlocked while at home or in a secured area at work.  Lockhart's statements regarding his whereabouts on the day prior to the loss are troubling.  At a minimum, his recollection was better during his deposition two years later than it was in the days immediately after reporting the loss.  Similarly, Lockhart's denial of have been in Wheeling, West Virginia is in stark contrast to Professor Tonguz's opinion that calls originated from both Mr. and Mrs. Lockhart's cell phones from that vicinity on May 19,

2007.  There is no countervailing expert opinion, but nevertheless, the fact finder could choose to believe Lockhart rather than Tonguz.[3]  It appears to be unlikely that the truck was stolen on May 20, 2007 in the manner in which Lockhart claimed.  On the other hand, it appears to be similarly unlikely that a person of Lockhart's stable family, employment and financial situation would engage in insurance fraud.  Indeed, State Farm recognizes that "motive is an issue."  In sum, the Court is unable to conclude as a matter of law that Lockhart breached the contract.


Conclusion

        There is a significant difference between the bad faith and breach of contract claims.  The elements are different and Plaintiff has a much more difficult burden to prove bad faith.  As explained in *Cantor v. The Equitable Life Assurance Society of the U.S.*, 1999 WL 219786 at *2 (E.D. Pa. Apr.12, 1999), to defeat a bad faith claim, "an insurance company is not required to demonstrate its investigation yielded the correct conclusion or even that its conclusion more likely than not was accurate."  In this case, State Farm conducted a comprehensive investigation and Lockhart certainly cannot prove by clear and convincing evidence that State Farm lacked a reasonable and objective basis for its decision to deny coverage.  On the other hand, the Court is unable to conclude as a matter of law that State Farm's underlying decision was correct.  The Court notes that this result is similar to that reached in  *Horowitz v. Federal Kemper Life Assur.*

---

        [3]The evidence regarding alleged misrepresentations surrounding the 2003 claim is not sufficient to entitle State Farm to summary judgment.  Such evidence primarily impacts Lockhart's credibility (which must be evaluated at trial) and has only a tangential impact as to whether Lockhart's truck was stolen in 2007.  The Court reserves ruling as to whether or not such evidence will be admissible at trial.

*Co.*, 57 F.3d 300, 307-08 (3d Cir. 1995) (insurer entitled to summary judgment on bad faith claim but remanding for trial on breach of contract claim), and *Montgomery*, 836 F. Supp. at 292 (insurer did not act in bad faith in denying claim, but material issues of fact precluded summary judgment as to whether insurer was entitled to rescind policy due to insured's alleged fraud and misrepresentations).  In accordance with the foregoing, State Farm is entitled to summary judgment on the bad faith claim, and the Court will conduct a non-jury trial on the breach of contract claim.

An appropriate Order follows.


McVerry, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TOM LOCKHART,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **2:08-cv-993** |
| **v.** | ) | |
| | ) | |
| **STATE FARM MUTUAL AUTOMOBILE** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER OF COURT**

AND NOW this 16th day of February, 2010, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** that DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 (Document No. 34) is **GRANTED** to Defendant State Farm Mutual Automobile Insurance Company on Plaintiff's bad faith claim and **DENIED** on Plaintiff's breach of contract claim.

Plaintiff shall file a pretrial statement on or before March 16, 2010.

Defendant shall file its pretrial statement on or before April 6, 2010.

BY THE COURT:

s/  Terrence F. McVerry
United States District Court Judge

18

cc:    George M. Kontos, Esquire
        Email: gkontos@spkpowerlaw.com
        Carlyle J. Engel, Esquire
        Email: cjengel@spkpowerlaw.com

        Ansley S. Westbrook II, Esquire
        Email: ansley.westbrook@dinslaw.com
        Randal M. Whitlatch, Esquire
        Email: randal.whitlatch@dinslaw.com